CASE NO.: 22-13880-HH

---

BOYAN SUBOTIC,
Appellant,

v.

JABIL, INC.
Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
Case No.: 8:21-cv-2137-VMC-SPF

---

APPELLANT'S INITIAL BRIEF

Shaina Thorpe
Florida Bar No. 55464

ThorpeLaw, P.A.
1228 East 7th Ave., Suite 200
Tampa, Florida 33605
Tel: (813) 400-0229
Fax: (813) 944-5223
Email:    shaina@thorpelaw.net
        admin@thorpelaw.net

*Attorney for Plaintiff-Appellant Boyan Subotic*

# APPELLANT'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Eleventh Circuit Rule 26.1-2, Appellant Boyan Subotic, by and through undersigned counsel, hereby files his Certificate of Interested Persons and Corporate Disclosure Statement:

1. Covington, Hon. Virginia – District Court Judge

2. Creed, Dennis – Former Counsel for Defendant/Appellee

3. Creed Law Group, PLLC d/b/a Creed & Hall – Former Law Firm of Defendant/Appellee's Counsel

4. Flynn, Hon. Sean – Magistrate Judge

5. Grob, William E. – Counsel for Defendant/Appellee

6. Hall, Bradley – Former Counsel for Defendant/Appellee

7. Jabil, Inc. a/k/a Jabil Circuit, Inc. (NYSE Symbol: JBL) – Defendant/Appellee

8. Ogletree, Deakins, Nash, Smoak & Stewart, P.C. – Law Firm of Defendant/Appellee's Counsel

9. Subotic, Boyan – Plaintiff/Appellant

10. Thorpe, Shaina – Counsel for Plaintiff/Appellant

11. ThorpeLaw, P.A. – Law Firm of Plaintiff/Appellant's Counsel

_/s/ Shaina Thorpe_

Shaina Thorpe
Florida Bar No. 55464

ThorpeLaw, P.A.
1228 East 7th Ave., Suite 200
Tampa, Florida 33605
Tel: (813) 400-0229
Fax: (813) 944-5223
Email:    shaina@thorpelaw.net
        admin@thorpelaw.net

_Attorney for Plaintiff-Appellant Boyan Subotic_

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Boyan Subotic ("Subotic") believes that the decisional process would benefit from oral argument because contemporaneous questioning by the Tribunal would assist in evaluating issues in the summary judgment filings that were not addressed by the district court in the order on appeal, but which are nonetheless dispositive of the issues on appeal.

## TABLE OF CONTENTS

APPELLANT'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................... **i**

TABLE OF CONTENTS........................................................................... **ii**

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.....1

STATEMENT OF THE ISSUES..................................................................2

STATEMENT OF THE CASE....................................................................3

    A. NATURE OF THE CASE, COURSE, AND DISPOSITION OF PROCEEDINGS BELOW.......3

    B. STATEMENT OF FACTS .................................................................4

    C. STANDARD OF REVIEW ...............................................................10

SUMMARY OF THE ARGUMENT ...................................................11

I. THE DISTRICT COURT'S DECISION ON SUMMARY JUDGMENT WAS NOT BASED ON CAREFUL CONSIDERATION OF THE ALL OF THE RECORD EVIDENCE. ......................................................................12

II THE DISTRICT COURT DID NOT HOLD JABIL TO ITS BURDEN OF PROOF AT SUMMARY JUDGMENT ON THE DISCRIMINATION CLAIMS.
    15

    A. JABIL DID NOT ADDRESS THE MIXED-MOTIVE THEORY OF DISCRIMINATION IN ITS MOTION. ..............................................................................17

B.  THE RECORD EVIDENCE DOES NOT SUPPORT THE CONTENTION AS TO A

SIMILARLY-SITUATED COMPARATOR AS TO THE DISCRIMINATORY TERMINATION OF

SUBOTIC. ...................................................................................................18

C.  THE RECORD EVIDENCE DOES NOT SUPPORT THE CONTENTION AS TO A

SIMILARLY-SITUATED COMPARATOR AS TO THE DISCRIMINATORY DISCIPLINE OF

SUBOTIC. ...................................................................................................18

III.   A *DE NOVO* REVIEW OF THE RECORD EVIDENCE SHOWS THAT

SUBOTIC SHOULD HAVE SURVIVED SUMMARY JUDGMENT. ................21

A.  CIRCUMSTANTIAL EVIDENCE OF MIXED-MOTIVE DISCRIMINATION UNDER

TITLE VII AND THE FCRA. .........................................................................21

1.   *Discipline* ............................................................................22

2.   *Termination* ...........................................................................24

B.  LEGITIMATE, NONDISCRIMINATORY, NON-RETALIATORY REASON(S) WITH

RESPECT TO SINGLE-MOTIVE THEORY OF DISCRIMINATION AND RETALIATION

CLAIMS. ...................................................................................................25

C.  THE EVIDENCE OF PRETEXT IS SO STRONG THAT IT CREATES THE INFERENCE OF

JABIL'S TRUE, UNLAWFUL MOTIVATIONS ...........................................26

CERTIFICATE OF SERVICE ................................................................32

# TABLE OF CITATIONS

**Cases**

*Alvarez v. Royal Atl. Developers, Inc.*,

610 F.3d 1253 (11th Cir. 2010)............................................................26

*Brown v. Gadsden Reg'l Med. Ctr. LLC*,

748 Fed. Appx. 930 (11th Cir. 2018) ...................................................16

*Celotex Corp. v. Catrett*,

477 U.S. 317 (1986) ..................................................................... 16, 19

*E.E.O.C. v. Joe's Stone Crab, Inc.*,

220 F.3d 1263 (11th Cir. 2000)............................................................19

*Edmondson v. Velvet Lifestyles, LLC*,

43 F.4th 1153 (11th Cir. 2022)...................................................... 11, 17

*Harris v. Shelby Cnty. Bd. of Educ.*,

99 F.3d 1078, 1084 (11th Cir. 1996)....................................................22

*Hornsby-Culpepper v. Ware*,

906 F.3d 1302 (11th Cir. 2018)............................................................16

*Jones v. UPS Ground Freight*,

683 F.3d 1283 (11th Cir. 2012)............................................................10

*Lawson v. Life of the S. Ins. Co.*,

648 F.3d 1166 (11th Cir. 2011)............................................................10

*Quigg v. Thomas County School District*,

    814 F.3d 1227 (11th Cir. 2016)............................................................22

*Reese v. Herbert*,

    527 F.3d 1253 (11th Cir. 2008)............................................................10

*Reeves v. Sanderson Plumbing Products, Inc.*,

    530 U.S. 133 (2000) ............................................................................30

*Steffens v. Nocco*,

    2023 WL 2591414 (11th Cir. 2023)......................................................21

*Strickland v. Norfolk S. Ry. Co.*,

    692 F.3d 1151 (11th Cir. 2012)............................................................13

*United States v. Brown*,

    415 F.3d 1257 (11th Cir. 2005)............................................................11

**Statutes**

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1367 ........................................................................................1

**Rules**

Fed. R. App. P. 4(a)(1)(A) ..........................................................................2

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal is from the United States District Court for the Middle District of Florida, Tampa Division. The district court had federal question jurisdiction over Plaintiff-Appellant Boyan Subotic's ("Subotic") claims against his former employer, Defendant-Appellee Jabil, Inc., ("Jabil"), under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). 28 U.S.C. § 1331. The district court also had supplemental jurisdiction over Subotic's Florida state law claims under the Florida Civil Rights Act of 1991, as amended ("FCRA"), and the Florida Whistle-blower's Protection Act ("the Act"), as his claims under those laws arose out of the same nexus of operative facts as the claims under the federal laws. 28 U.S.C. § 1367.

This Court has jurisdiction over appeals from final orders of the district courts of the United States. 28 U.S.C. § 1291. The district court rendered a final order in this case on October 18, 2022, when it granted summary judgment in favor of Jabil ("the Order"). (Vol. IV at 701-42.)[1] Judgment was entered against Subotic on October 18, 2022. (*Id.* at 743.) This appeal was thereafter timely noticed by

---

[1] The record on appeal has been submitted under the title "Appendix" consistent with the applicable rules. The Appendix is broken down into four volumes (I, II, III, and IV) to comply with the Court's requirements. As such, references to the record on appeal will be designated as follows: (Vol. [No.] at [page(s)][, sub-page(s) if condensed transcript.])

Subotic on November 16, 2022 by filing a Notice of Appeal with the district court.[2]
(*Id.* at 745-90.) Thus, this appeal is from a final order and subsequent judgment
that disposes of all Parties' claims and/or defenses.

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion by refusing to consider
Subotic's record evidence.

2.      Whether the district court erred by shifting the summary judgment
burden to Subotic despite Jabil failing to discharge its initial burden in the
Defendant's Dispositive Motion for Summary Judgment on Counts I-VII of
Plaintiff's Complaint ("Motion")(Vol. I at 56-80.).

3.      Whether a *de novo* review of the record evidence requires reversal of
the district court's Order granting summary judgment in favor of Jabil.

4.      Whether the district court erred in granting summary judgment
because the undisputed material facts, when taken in the light most favorable to
Subotic and drawing all inferences in his favor, could lead a reasonable jury to
determine that Jabil unlawfully discriminated against Subotic in disciplining him
and terminating his employment.

5.      Whether the district court erred in granting summary judgment
because the undisputed material facts, when taken in the light most favorable to

---

[2] *See* Fed. R. App. P. 4(a)(1)(A).

Subotic and drawing all inferences in his favor, could lead a reasonable jury to determine that Jabil unlawfully retaliated against Subotic for his protected conduct by terminating his employment.

## STATEMENT OF THE CASE

### A. Nature of the Case, Course, and Disposition of Proceedings Below

The initial Complaint was filed on September 7, 2021, alleging, in short, that Jabil discriminated against Subotic on behalf of his national origin/ethnicity and retaliated against him by firing him after he reported his concerns of discrimination. (Vol. I at 11-30.) In so doing, Subotic sought relief under Title VII, the FCRA, Section 1981, and/or the Act. (*Id.*)

Jabil filed the Defendant's Answer and Affirmative Defenses to the Complaint ("Answer") on November 1, 2021. (Vol. I at 31-51.) Upon the completion of discovery, Jabil filed its Motion. (*Id.* at 56-80.) In support of its Motion, Jabil tendered the deposition transcript of Subotic,[3] and the affidavits of Deanna Doheny ("Doheny")(*Id.* at 84-117), Natasha Holton ("Holton")(*Id.* at 118-50), Andrew Eells ("Eells")(*Id.* at 151-71), Ron Anderson ("Anderson")(*Id.* at 172-

---

[3] Jabil originally filed the deposition transcript for Subotic contemporaneously with the Motion and its other exhibits in support thereof. However, upon review, it was discovered that Subotic's social security number had not been redacted from the filing. Accordingly, the district court granted a motion by Subotic to redact the original filing. Jabil thereafter re-filed the deposition transcript with the appropriate redactions. (Vol. IV at 573-700.)

74), and Jabil's Verified Answers to [] Subotic's First Set of Interrogatories (*Id.* at 175-83).

Subotic then filed his Response in Opposition to the Motion ("Response"). (Vol. III at 427-47.) In support of the arguments in his Response, Subotic filed the deposition transcripts of Doheny (Vol. II at 199-345), Holton (*Id.* at 346-80), and Eells (*Id.* at 381-97), along with the Defendant's Initial Rule 26(a)(1) Disclosures (*Id.* at 398-404), Jabil's Unverified Answers to [] Subotic's First Set of Interrogatories (*Id.* at 405-12), and Second Amended Notice of Depositions (*Id.* at 413-16). Jabil filed a Reply to the Response ("Reply"). (Vol. III at 448-54.) On September 1, 2022, and subsequently to the Reply, Subotic filed the Plaintiff's Omnibus Motion in *Limine*, which included the deposition transcript of Scott Marsala ("Marsala"). (*Id.* at 455-562.)

About six weeks later, on October 18, 2022, the District Court issued the Order granting the Motion (Vol. IV at 701-42), and the Clerk of Court entered the Judgment against Subotic the same day (*Id.* at 743-44). This appeal timely followed. (*Id.* at 745-90.)

## B. *Statement of Facts*

Reversal of the Order is supported by a *de novo* review of the record evidence the district court had available to it at the time it rendered its Order, which establish the following facts:

1.     Subotic is ethnically Serbian. Jabil is aware that "Serbian" is an ethnicity and not just a nationality. (Vol. II at 251, p.210.)

2.     Subotic was hired by Jabil as a Support Technician 2 ("Tech 2") on April 17, 2017 which is a position he consistently held until his termination on August 18, 2020.

3.     In July and August of 2020, Subotic's immediate supervisor was IT Supervisor Eells. (Vol. II at 213, p.59.) Eells knew that Subotic was Serbian. (Vol. II at 386-87, pp. 24-26.) Eells directly reported to Holton, who had taken on the position of Site IT Manager in early-July 2020. (Vol. II at 213, p.59.) (*Id.*)

4.     In July 2020, there were three Support Technician 1s ("Tech 1") working under Eells: Eric Flynn ("Flynn"), Marsala, and Manny Frietas ("Freitas"). (Vol. II at 29-3 at 56.) Michael Ho ("Ho") was promoted from Tech 1 to Tech 2 shortly after Holton became the supervisor over the technicians. (*Id.*)

5.     Holton issued Subotic a written verbal on July 13, 2020, which Jabil considers a disciplinary action. This written discipline was issued in connection with a purported failure of Subotic to communicate with Holton on July 11, 2020.

6.     Holton issued Subotic a second disciplinary action on July 20, 2020 as a result of an issue raised by Marsala. Marsala reported to Eells that Subotic the on-site telephone had been sitting on the desk unattended, which resulted in Subotic being written up on July 20, 2020 for not having the phone. (Vol. II at 368,

p.90-92.) Holton did not conduct an independent investigation as to whether Subotic had actually left the on-site telephone unattended; rather, she relied on the information Eells had received from Marsala to authorize Subotic's discipline. (*Id.* at 370-71, pp. 98-101.) Marsala knew that Subotic was Serbian, and commented that he was "not going to eat your pity ethnic food." (Vol. I at 593, p.73.)

7. On July 31, 2020 at 5:31 a.m., Subotic sent an email to HR Doheny copying Holton and Eells, which stated he believed he was experiencing discrimination "on the basis of the national origin as being of a Serbian ethnicity." (Vol. II at 255.)

8. After Doheny received Subotic's July 31, 2020 email alleging discrimination on the basis of his being Serbian, Doheny commenced her investigation into his allegations ("Investigation 1") and promptly informed the Director of Operations Anderson of the email and its contents. (Vol. II at 220-21, pp. 88-89; *Id.* at 241, pp. 170-72.)

9. Doheny met with Subotic on July 31, 2020 at 11:35 a.m. and she took notes of the encounter. (Vol. II at 256-57.) In that conversation and in follow-up emails he sent to Doheny on July 31, 2020 at 12:14 p.m. and 12:24 p.m., Subotic told Doheny about how he felt he had been targeted for discipline since Holton had replaced Romeo Cooper ("Cooper") as his supervisor and that he believed Marsala had been "spying on him." (*Id.*) Subotic explained that on Saturday, July 11, 2020,

his shift had been over at 10:15 a.m. and that because the tickets had been submitted incorrectly by the employees with the computer problems, he could not see the tickets and his offsite phone would not have been triggered to ring. (Vol. IV at 665-61.) He further explained that he was sleeping when Holton had called the first time. (*Id.*) He also provided Doheny with a copy of the email he had sent to the employees on July 11, 2020 and evidence from his offsite work phone to confirm that he had, in fact, talked with Holton at about 12:59 p.m. (*Id.*)

10.     Doheny interviewed Holton on Monday, August 3, 2020, in regards to the July 31, 2020 allegations of discrimination made by Subotic. Doheny also took contemporaneous notes of that interview. (Vol. II at 258-59.)

11.     The only interviews that were part of Investigation 1 were Doheny's interview of Subotic on July 31, 2020 and her interview of Holton on August 3, 2020.  Doheny did not interview Eells, Jaclyn Mitchell, Marsala, or anyone else who might have had knowledge of the discriminatory actions Subotic raised as part of Investigation 1. (Vol. II at 235, p.148.)

12.     During Doheny's interview with Holton on August 3, 2020 in connection with Investigation 1, Holton revealed for the first time that she had allegedly been investigating Subotic on her own for several weeks about an allegation that Subotic had locked a co-worker, Tatianna Lane ("Lane"), out of her account ("Lane Lockout Issue").  (*Id.* at 221, p.90; *Id.* at 222, p.94; *Id.* at 235,

p.146; *Id.* at 258-59.)

13.     Doheny could not confirm that Subotic was in his cubicle on July 2, 2020 at the time his assigned computer was used to allegedly lock Lane out of her computer. (Vol. II at 224-25, pp. 104-06.) Doheny has no actual physical evidence that the person sitting behind Subotic's computer was, in fact, Subotic at any of the times that Lane's account was allegedly locked. (Vol. II at 252-53, pp. 216-17.)

14.     Doheny never asked Subotic about login attempts, lockouts, or anything else specific to Lane's computer. (Doc. 29-2 at 53, p.212.) While Doheny and Subotic spoke in general terms about these technical issues, Lane was never mentioned in connection with these issues, or identified in any way. (*Id.*)

15.     There are no documents to substantiate that Holton's investigation into the Lane Lockout Issue began any time before Subotic's July 31, 2020 report of Holton's discriminatory behavior. (*See, e.g.*, Vol. II at 271-278.) In fact, the first email transmitted between Holton and Doheny about the Lane Lockout Issue was sent on August 3, 2020 at 2:57 p.m. – three hours after the interview where Holton raised the issue for the first time. (*Compare* Vol. II at 258-59 *with* Vol. II at 278.) There is no evidence that Holton would ever have brought the Lane Lockout Issue to Doheny's attention if Holton had not been directed to attend the August 3, 2020 meeting with Doheny to address Subotic's complaint of discrimination. (Id. at 245, pp. 187-88.)

16.     Upon learning of the Lane Lockout Issue from Holton, Doheny began "Investigation 2" into the allegations against Subotic. (Vol. II at 220-21, pp. 88-89.) Doheny relied on Holton's explanation of the technological information concerning the allegations against Subotic, even though Doheny knew Holton's involvement could look like a conflict of interest, given Subotic's allegation of discrimination against her only a few days beforehand. (*Id.* at 242, p.176; *Id.* at 270.)

17.     Anderson did not engage in an independent investigation as to Subotic's allegations of discrimination or the allegations against Subotic as to the Lane Lockout Issue. (Vol. II at 242, p.173.) Holton had the authority to override the termination recommendation of Doheny and Anderson, making Holton the decisionmaker. (Vol. II at 214 pp.63-64; *accord* Vol. II at 287-88.)

18.     Nangellie Sanlnocencio ("Sanlnocencio") worked with the Defendant as a project engineer. (Vol. II at 378, pp. 130-32.) An attempt was made to login to Lane's account from the computer at Sanlnocencio's desk causing Lane's account to be locked out on June 26, 2020. (*Id.*; *see also* Vol. II at 274, 277.) No investigation was conducted into why one of Lane's lockouts was from Sanlnocencio's computer. (Vol. II at 378, pp. 131-32.)

19.     Doheny interviewed Subotic on August 14, 2020 in connection with Investigation 2. (Vol. II at 267-68.) Doheny never actually asked Subotic about

Lane specifically. (*Id.*)

20.    On August 7, 2020, Holton advised Doheny that she did not "see any IT policies, outside of the job description, that directly address ethical standards." (Vol. II at 272.) Despite this, on August 18, 2020, Subotic was allegedly terminated "for a breach of Jabil's policies," (Vol. I at 65 ¶¶ 48-49), with those "policies" being "Jabil's Security Policy and Code of Conduct." (*Id.* at 68).

## C.    *Standard of Review*

Two standards of review apply on this appeal. First, because the overarching purpose of the appeal is the review of the Order on summary judgment, the standard of review is *de novo*. *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1170 (11th Cir. 2011). In its *de novo* review of an order granting summary judgment, "all facts and reasonable inferences must be made in favor of the nonmoving party," who in this case is Subotic. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). A district court commits reversible error "by failing to review the full record on summary judgment and by failing to construe the facts and make all reasonable inferences and credibility choices in favor of the non-moving party." *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008).

A second standard of review is applicable in this appeal because, in the course of rendering its decision on summary judgment, the district court refused to consider record evidence tendered by Subotic. Evidentiary decisions are reviewed

under the abuse of discretion standard. *United States v. Brown*, 415 F.3d 1257, 1264–65 (11th Cir. 2005). By applying these legal standards to the decision on appeal, it is readily apparent that the Order is due to be reversed so the jury, sitting as finder of fact, can render a verdict consistent with its assessment of the evidence.

## SUMMARY OF THE ARGUMENT

"'Summary judgment' is a lethal weapon, and courts mut be mindful of its aims and targets and beware of overkill in its use." *Edmonson v. Velvet Lifestyles, LLC*, 43 F. 4th 1153, 1159 (11th Cir. 2022)(*citing Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967)). In this case, the basis for using that "lethal weapon" was absent, and Subotic should not have had his constitutional right to a trial by jury taken from him.

The district court fundamentally erred at the outset by disregarding Subotic's record evidence based on the procedural preference that the line number of the deposition page be specifically identified. After abusing its discretion by ignoring record evidence, the district court erred by shifting the summary judgment burden onto Subotic and considering the motivating factor argument, even though it had not been raised by Jabil.

Upon a *de novo* review the record evidence provided by Subotic, summary judgment cannot be sustained because the evidence is either insufficient under the

law, or disputed as to material facts. The Order is due to be reversed with Subotic being permitted to proceed to a jury trial without delay.

## ARGUMENT

The Motion should not have been granted because Jabil failed to carry its burden, and the undisputed material facts showed that Jabil was motivated, at least in part, to discipline Subotic employment for being "Serbian," whether as a national origin and/or an ethnicity. Furthermore, when Subotic unequivocally objected to Jabil's discriminatory treatment towards him, he was swiftly terminated on pretextual grounds. As described herein, a sound application of the correct law to the undisputed material facts shows that Subotic was discriminated against and retaliated against in violation of Title VII, the FCRA, Section 1981, and the Act, or, at minimum there are disputes as to material facts on these claims. As such, the Order merits reversal.

## I. THE DISTRICT COURT'S DECISION ON SUMMARY JUDGMENT WAS NOT BASED ON CAREFUL CONSIDERATION OF THE ALL OF THE RECORD EVIDENCE.

In the Order, the district court began its analysis by stating:

Additionally, Subotic failed to properly dispute certain of Jabil's statements of material fact because Subotic did not cite any record evidence in support of such dispute – a requirement the Court explained in its order regarding summary judgment briefing. See (Doc. # 17 at 2)("Each denial must set forth a pinpoint citation to the record where the fact is disputed…In deciding a motion for summary judgment, the Court will deem admitted any fact in the statement of material facts that the opposing party does not specifically controvert, provided record evidence

supports the moving party's statement."). Subotic also fails to properly cite deposition testimony, as he does not cite line designations as required. See (Id. at 1-2)("[A] reference to 'Deposition of Jones' is insufficient; the page and **line number** of the deposition transcript must be included." (emphasis added)).

(Vol. IV at 721-22)(formatting in original).

The Order is fundamentally flawed because it is rooted in the district court's refusal to consider all of the record evidence before it, which was abuse of discretion. Indeed, "[t]he District Court [must] consider all evidence in the record when reviewing a motion for summary judgment—pleadings, depositions, interrogatories, affidavits, etc.—and can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)(*quoting Tippens v. Celotex Corp.,* 805 F.2d 949, 952 (11th Cir.1986)). This Court has held that "[t]he district court abuses its discretion when it applies an incorrect legal standard, applies the standard in an unreasonable or incorrect manner, *or ignores or misunderstands the relevant evidence.*" *Stimson v. Stryker Sales Corp.*, 835 Fed. Appx. 993, 995 (11th Cir. 2020)(emphasis supplied).

The district court disregarded its obligation to consider the record and whether statements of fact were supported by the record, in favor of its procedural

preferences.[4] While there is no doubt that a district court has the discretion to manage its docket, affirming the district court's enforcement of its procedural preferences in this case would set a dangerous precedent. Essentially, district courts would be permitted to supersede decades of summary judgment jurisprudence on the basis of a procedural preference.

At the time the district court granted the Motion, it had the full transcripts of Doheny, Holton, Eells, and Marsala available to it via Subotic's filings. (Vol. II at 199-397, 455-562.) However, the District Court refused to consider these transcripts or any of Subotic's additional statements of material fact because the citations to the page of the deposition *did not include line numbers*. Subotic's facts were supported by readily-available, easily locatable, record evidence.

Subotic went to the effort of filing his supporting record evidence before he filed his Response so that he could assist the district court in locating materials by citing the docket number. (*See* Vol. II, 199-416.) Subotic also used precision when citing to condensed transcripts, referencing the page number as provided by the docket *and* the page number of the condensed transcript. (Vol. III at 429, n.5.) Subotic did not just cite to "Deposition of [Witness]" as prohibited by the district court's preferences. At most, Subotic cited three consecutive pages of a deposition

---

[4] The line citation requirement is specific to the district judge who decided this case, and is not a requirement of the Middle District of Florida's Local Rules. (*See* Vol. I at 52-55.) By contrast, even this Tribunal's rules do not require such specificity.

transcript in support of a premise, but, typically, it was only one page. (*See id.* at 428-32.)

Not only did the district court refuse to consider Subotic's record evidence on the basis of a procedural preference, it disparately enforced that preference in favor of Jabil. The district court was willing to accept Jabil's citations to lengthy, single-spaced paragraphs in the affidavits it tendered in support of the Motion. (*See, e.g.,* Vol. IV at 716)(*citing* Vol. I at 87-88 ¶¶ 21-24.) The district court did not refuse to consider affidavit paragraphs even though they were lengthier than a deposition page would have been, were the transcript not double-spaced. By contrast, the district court disregarded all of record evidence tendered by Subotic because the line numbers were not identified.

While Subotic understands that the district court need not scour the record to locate evidence, refusing to read a few discrete deposition pages because a *line number* was not cited turns the summary judgment standard on its head. The "lethal weapon" of summary judgment should not be permitted to discharge on such an arguably frivolous and disparately-applied basis.

## II   THE DISTRICT COURT DID NOT HOLD JABIL TO ITS BURDEN OF PROOF AT SUMMARY JUDGMENT ON THE DISCRIMINATION CLAIMS.

Jabil did not discharge its initial burden in the Motion and, as such, summary judgment was due to be denied irrespectively of whether Subotic even filed a

response. The movant "bears the initial burden to demonstrate the basis for its motion, and must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018)(internal citations omitted). The moving party "may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* It is *after* that initial burden is met by the moving party that the burden shifts to the non-moving party. *Brown v. Gadsden Reg'l Med. Ctr. LLC*, 748 Fed. Appx. 930, 935 (11th Cir. 2018)(internal citations omitted).

However, in issuing the Order and without identifying if or how Jabil met its burden, the district court stated that "[b]ecause [Subotic's] response only discusses the mixed-motive theory of discrimination, Subotic has waived any argument that his claims should survive summary judgment under the *McDonnell Douglas* framework." (Vol. IV at 732.) This is an incorrect application of the summary judgment standard and is a *de facto* assumption that Jabil had met its burden as to that aspect of the case. As the moving party, Jabil bore the initial burden to either prove that there was no evidence to support a claim under the *McDonnell Douglas* framework or to affirmatively demonstrate that Subotic could not meet his burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331–32 (1986). If Jabil did not meet its initial burden, then Subotic did not have any duty to even respond to the

Motion to survive summary judgment. *Edmondson*, 43 F.4th at 1159–60 2022)(*citing Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1246 (11th Cir. 1999)).

The Court did not address the sufficiency of Jabil's evidence with respect to the *prima facie* showing under *McDonnell Douglas* as to the disciplinary write-ups or the termination, or whether Jabil met its burden of producing of a legitimate, nondiscriminatory reason in the context of the discriminatory discipline. Without identifying how Jabil satisfied its burden on summary judgment as to *McDonnell Douglas*, the district court could not grant the Motion.

## A. Jabil did not address the mixed-motive theory of discrimination in its Motion.

In Counts I, II, and III of his Complaint, Subotic alleged that his "national origin was, at minimum, a motivating factor in [Jabil's] decision to take adverse actions against him, thereby treating him differently than similarly situated non-Serbian employees." (Vol. I at 16 ¶ 40, 17 ¶ 50, 19 ¶ 59.) Thus, Subotic asserted in his Complaint that his Serbian status could have been one of several reasons for the adverse actions, i.e. a motivating factor, or even the sole reason.

In the Motion, Jabil only argued that Subotic could not succeed under the *McDonnell Douglas* burden shifting framework. Despite this, the district court determined that "[u]nder the particular circumstances of this case, the Court finds that Jabil has not waived the argument that Subotic failed to establish a dispute of material fact under the mixed-motive theory of discrimination." (Vol. IV at 733.)

Jabil did not present an argument to the district court in the Reply as to what "particular circumstances" warranted ignoring its failure to make the mixed-motive argument in its Motion. Rather, the district court *sua sponte* determined that Jabil did not waive the argument.

**B.** **The record evidence does not support the contention as to a similarly-situated comparator as to the discriminatory termination of Subotic.**

In the Motion, Jabil does not present any evidence or argument as to the existence or non-existence of a similarly-situated comparator in the context of Subotic's termination. (Vol. I at 66-67.) Jabil simply did not set forth a basis for the district court to determine that Jabil had proven that Subotic could not carry his *prima facie* burden under *McDonnell Douglas*. Therefore, taking the evidence in the light most favorable to Subotic, it must be assumed that Jabil is not disputing Subotic's ability to carry that burden, which means that the burden would shift to Jabil to produce its legitimate, nondiscriminatory reason(s) for terminating Subotic.

**C.** **The record evidence does not support the contention as to a similarly-situated comparator as to the discriminatory discipline of Subotic.**

Jabil argued that Subotic's discrimination claims as to the disciplinary write-ups fail because he "has not presented – and cannot present – any evidence that 'similarly situated' employees outside his protected class were treated more favorably than him." (Vol. I at 66.) Under the relevant summary judgment

standard, a movant cannot simply assert that there is no evidence of an element. *Celotex Corp.,* 477 U.S. at 332 (1986)("Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient….Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record.") Jabil did not provide record evidence to support that there were not any similarly-situated comparators.

Instead, Jabil opted to attempt to show that Subotic could not have proven an essential element of his claim by asserting that Jabil disciplined other individuals as to the issue of carrying the on-site phone.[5] But the question in the *prima facie* analysis under *McDonnell Douglas* is not whether the employer can prove that other individuals were also disciplined, it is whether the employee can show that a similarly-situated individual outside of his protected class was treated more favorably. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). Thus, Jabil's presentation of the discipline of Freitas and Flynn are not relevant to the *prima facie* analysis.[6]

---

[5] Jabil made no argument as to the existence of a similarly situated comparator with respect to the July 13, 2020 write-up as to the on-call issue.

[6] Subotic is not admitting that Freitas or Flynn are similarly situated in all relevant respects, only that their having been disciplined does not mean that Subotic cannot show the existence of a similarly situated individual outside of his protected class was not disparately disciplined. Furthermore, while Jabil's analysis is fatally-flawed because of this faulty logic on the issue of discipline for not carrying the

What is relevant is that Jabil knew that there were other individuals who were not carrying the on-site phone but who were not disciplined. Subotic told Doheny that he suspected that Marsala and another individual outside of Subotic's protected class also had not carried the on-site phone. (Vol. II at 264.) Subotic's report to Doheny was part of what he believed was evidence of being singled-out based on his Serbian status.

Doheny recommended Subotic's termination. (*Id.* at 214.) Accordingly, there is no reason to believe that if Doheny's investigation had substantiated that Marsala or the other employee did not carry the on-site phone as Subotic had alleged, that Doheny could not have likewise recommended the discipline of Marsala. But the undisputed fact is that she did not recommend the discipline of Marsala.

Jabil did not present any legitimate, nondiscriminatory reason to controvert this evidence of the *prima facie* case as to Subotic's discipline compared to Marsala.[7]  As such, Jabil failed to carry its burden of proving that summary

---

on-site phone, Jabil does not make any argument whatsoever about whether or not Subotic can prove that he was not disparately disciplined with respect to the on-call incident that resulted in the July 13, 2020 disciplinary action.

[7] Though it did not present the argument on summary judgment, Jabil may try and argue on appeal that Marsala did not need to be disciplined because the allegation against him had not been substantiated, i.e. that it had a legitimate, nondiscriminatory reason for its inaction toward Marsala. However, such an argument is specious, as Holton and Eells had no difficulty disciplining Subotic on the basis of a third-hand report from Marsala that Holton did not investigate. (Vol.

judgment was proper as to the discriminatory discipline claim under McDonnell Douglas. The Motion should have been denied irrespectively of whether or not Subotic addressed the McDonnell Douglas standard in the Response. Denial of the Motion was the required result under applicable law.

## III. A *DE NOVO* REVIEW OF THE RECORD EVIDENCE SHOWS THAT SUBOTIC SHOULD HAVE SURVIVED SUMMARY JUDGMENT.

Had the district court considered all of the record evidence, it would have seen a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Steffens v. Nocco*, 2023 WL 2591414, at *2 (11th Cir. 2023)(internal citations omitted). Subotic presented "evidence that demonstrate[d] (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Id.* The district court, however, ignored that evidence and erroneously granted summary judgment for Jabil.

### A. Circumstantial Evidence of Mixed-Motive Discrimination under Title VII and the FCRA.

Assuming Jabil had preserved its summary judgment argument as to the

---

II at 368, pp. 90-91.) Furthermore, Doheny took the time to review the security camera footage when she was investigating Subotic as to the Lane issue, but did not take the time to look at the security footage to verify Subotic's concern about Marsala leaving the on-site phone unattended.

motivating factor aspect of Subotic's claims, which is denied, the record evidence, taken together, shows that there are triable issues as to Jabil's discriminatory motive. The motivating factor analysis "requires a court to ask only whether a plaintiff has offered 'evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action.'" *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016). The write-ups Subotic received on July 13, 2020 and July 20, 2020 were disciplinary. (Vol. II at 215.) Terminations are the quintessential adverse employment actions. *See, e.g., Telfair v. Fed. Exp. Corp.*, 934 F. Supp. 2d 1368, 1383 (S.D. Fla. 2013). As Subotic undisputedly satisfied the first *Quigg* factor by identifying adverse actions, only the second *Quigg* factor is at issue.[8]

### *1. Discipline*

The record evidence supports that even if Holton, herself, did not know of Subotic's Serbian heritage at the time she authorized Subotic's discipline for having allegedly left the telephone unattended, the discriminatory motive of Marsala and/or Eells can be imputed to her because she failed to conduct an

---

[8] The defense to a mixed-motive claim of discrimination is the same decision defense affirmative defense. *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1084 (11th Cir. 1996). Jabil did not raise this defense in the Answer and thereby waived it. (Vol. I at 44-49.) Additionally, Jabil did not argue the same decision defense in its Motion or in its Reply. (*See generally* Vol. I at 56-80, Vol. III at 448-54.)

independent investigation into the allegations. *Duncan v. Alabama*, 734 Fed. Appx. 637, 639 (11th Cir. 2018)("Under [the cat's paw] theory, if the decision-making party followed the biased recommendation without independently investigating the complaint—essentially acting as a rubber stamp of the biased recommendation— then the recommender's discriminatory animus is imputed to the decisionmaker.") Furthermore

> Where the statute giving rise to the cause of action only requires proof that the employee's protected characteristic was a "motivating factor" in the adverse employment decision, liability may be established by showing that (1) the adverse decision is "the intended consequence" of the supervisor's biased report or recommendation, and (2) the supervisor's biased action was "a causal factor" of the decisionmaker's adverse decision.

*Blash v. City of Hawkinsville*, 856 Fed. Appx. 259, 266 (11th Cir. 2021)

The record evidence shows that Marsala did not care for Subotic's "ethnic" food, that he reported Subotic's alleged failure to carry the on-site phone to Eells, and that Eells, who also knew of Subotic's Serbian heritage, issued the July 20, 2020 disciplinary action in tandem with Holton. Thus, even if Holton had a potentially valid, alternative reason for issuing the discipline, under the cat's paw theory, the evidence of a discriminatory intent can be inferred from Marsala.

## 2. Termination

The evidence is undisputed that, at the time of Subotic's termination, Holton, Doheny, and Anderson were aware that Subotic considered himself Serbian. In his email of July 31, 2020, Subotic expressly stated:

> I just want to report to you that I have been continuously discriminated against in the past 2 months on the basis of the national origin as being of a Serbian ethnicity. What I have experienced lately leads me to believe that I am being setup to get fired by my manager. I also think that I have been treated differently than my other co-workers. In addition, it appears that I have been treated unfairly at this same time. None of these things were happening more than 2 months, but all those things have been going on only in the past 2 months. I will also report the discrimination to the EEOC.

(Vol. II at 255.)

In Doheny's report at the conclusion of Investigation 1, which was purportedly into Subotic's allegations of discriminatory discipline by Holton, Doheny noted that Subotic "[p]erceives that [Holton] is out to get him and looking for ways to fire him. Believes it is because of his ethnicity." (Vol. II at 264.) At minimum, it is clear that prior to the decision was made to terminated Subotic's employment, all of the individuals contributing to the decision were aware that he was Serbian. Between that knowledge, the lack of a similarly-situated comparator, and the evidence of pretext, (discussed further below), there are at minimum disputed issues of material fact as to whether Subotic's national origin was a motivating factor in his termination, rendering summary judgment improper.

## B. Legitimate, nondiscriminatory, non-retaliatory reason(s) with respect to single-motive theory of discrimination and retaliation claims.[9]

For the purposes of the Order, the district court assumed that Subotic had stated a *prima facie* case of retaliation under Title VII and the FWA, and analyzed the legitimate, non-retaliatory reason presented by Jabil for terminating Subotic's employment.[10] (Vol. IV at 724.)

However, the Court fills in a critical gap for Jabil, in that Jabil does not clearly state what its purported legitimate reason for terminating Subotic was, let alone support it with record evidence sufficient to meet its burden. At best, Jabil identifies its reasons for terminating Subotic as vaguely "for a breach of Jabil's policies" (Vol. I at 65 ¶¶ 48-49), with the most clarification being that it was "Jabil's Security Policy and Code of Conduct", neither of which speak to Subotic's alleged misconduct (*Id.* at 68). Based on the context of the asserted reason, the "breach" Jabil is referring to could have been that Subotic allegedly (1) attempted to access Lane's computer without a ticket and/or (2) locked Lane out of her

[9] As previously noted, Jabil did not raise the same decision defense and the district court did not address it in the Order.

[10] The district court appears to have inadvertently omitted the FCRA from its statement on this point for two reasons. First, the FCRA is interpreted consistently with Title VII. Second, the heading for the section where the statement falls includes the FCRA. (Vol. IV at 723.) While the district court disregarded the *McDonnell Douglas* burden-shifting analysis because it determined that Subotic had waived that argument by not discussing it in the Response, Jabil uses the same purportedly legitimate reasons for its actions to defend the discrimination claims as the retaliation claims. (*See* Vol. I at 67-69, 72-73.)

computer. (*Id.* at 67.) These are two very different accusations and make the real reason a moving target. While the shifting, if vague, rationale is in and of itself evidence of pretext, Subotic can show that each of these reasons is unworthy of credence.

### C.    The Evidence of Pretext is so Strong that it Creates the Inference of Jabil's True, Unlawful Motivations

That Jabil's asserted reason(s) for terminating Subotic is or are pretext for its unlawful motive, Subotic submits that the following "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the Jabil's] proffered legitimate reasons for its action" show that "a reasonable factfinder could find [Jabil's purported legitimate, non-retaliatory reason] unworthy of credence. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). To be clear: Subotic is not challenging the wisdom of Jabil's reasoning. The evidence shows that the reason is so unsupported by fact that the only conclusion that can be reached is that the reason is not genuine.

The first allegedly legitimate reason for Subotic's termination is that he attempted to access Lane's computer without a ticket. Critically, there is conflicting evidence as to whether a ticket is always required for a technician like Subotic to access another employee's computer. Marsala testified that "drive-bys"—where he would be stopped by co-workers looking for technical assistance as he was walking around the office – were a regular occurrence. (Vol. III at 537-

26

38.) The assistance Marsala provided via these "drive-bys" was not done via a ticket, and Marsala estimated that had he put in tickets for the "drive-bys" he would have had an additional 1,500 tickets during his time at Jabil. (*Id.* at 538.) Furthermore, the entire "Lane Lock-Out" situation was triggered by a time when Marsala was helping Lane because she had personally texted Marsala for assistance—not because she had submitted a ticket for the help. (Vol. III at 500.) Eells also acknowledged these "drive bys," testifying that there would not always be a ticket for technical support for issues like computer lock-outs. (Vol. II at 392, p.45.) In short, the record evidence shows that if attempting to access another employee's computer without a ticket were a violation of policy worthy of termination, then Marsala, Eells, and others should have also been terminated. And according to Doheny, nobody else has been terminated for violating the exact same policy as Subotic. (Vol. II at 231, p.129.)

There are also significant disputed issues of material fact as to the second asserted legitimate reason—that Lane was locked out of her computer by Subotic. Doheny testified that she could not confirm that it was Subotic who was at his computer at the time of the alleged lock-outs.

Jabil hangs its hat on this off-the-books investigation being an "intervening factor" and the real reason for Subotic's termination. But the reality is that it is not an intervening factor if it was injected into the discrimination investigation by

Holton as an excuse to terminate Subotic in retaliation for his complaint of discrimination.

Holton was irritated when she received Subotic's email on July 31, 2020 accusing her of discriminating against him on the basis of his being Serbian. (Vol. II at 377, pp.125-26.) It was Holton who brought up the "off-the-books" investigation of Subotic regarding the Lane Lockout Issue, *a propos* of nothing. (*See* Vol. II at 25-59.) Doheny testified that Holton had not given her any indication that she would have brought the Lane Lockout investigation to Doheny's attention, absent Doheny interviewing Holton in connection with the discrimination complaint by Subotic. (*Id.* at 245 pp. 187-88.)

Jabil admitted in its Motion that the allegedly intervening act was discovered "after [Subotic] complained of purported discrimination…" (Vol. II at 72.) Investigation 2 was a sham designed to result in Subotic's termination, as evidenced by the following incoherencies: No one investigated why another user's computer had also locked out Lane's account and whether there could be a security breach there. (Vol. II at 251-52, pp. 209-217.) Even when Doheny asked Holton about the other employee's lockout of Lane's computer, no answer was provided and the matter was dropped. (Vol. II at 358.) It is suspect that Doheny would not have interviewed Marsala about the Lane Lockout Issue after Holton told Doheny that Marsala had assisted Lane in uncovering Subotic's purported security breach.

(Vol. II at 251-53, pp. 209-217.) Doheny did not seek out or watch the video recordings of any other of the purported four lockout dates to ascertain whether Subotic was actually at his desk at the times these lockouts occurred. (*Id.*) Doheny interviewed Subotic on August 14, 2020 for the alleged purpose of investigating the Lane Lockout Issue and never asked him if he had ever attempted to access Lane's account without authorization, mention Lane's name at all, or show Subotic any of the documents which the Defendant believed supported his attempted access to Lane's computer.

Investigation 2 was driven by Holton, which is inconsistent with Doheny's alleged interest in avoiding a conflict of interest. Investigation 2 was initiated by Holton and there is no documentary evidence that Holton began her off-the-books investigation into Subotic before receiving his July 31, 2020 complaint of discrimination about her. (*See, e.g.,* Vol. II at 271-78.) All of the documentary evidence in support of Investigation 2 came from Holton. (*See id.*) Doheny relied on Holton to explain the information used in Investigation 2.

With all of these implausabilities, inconsistencies, and incoherencies, a finder of fact will have more than enough of a basis to determine that the Defendant's legitimate, non-retaliatory reason is, in fact, nothing but pretext to cover its unlawful motivation. Furthermore:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See *id.,* at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). The evidence of pretext as to Jabil's asserted legitimate, nondiscriminatory and/or non-retaliatory reasons is so plentiful, that a reasonable jury could infer that Jabil's real reason for terminating Subotic was an unlawful one. Summary judgment, therefore, was improvidently granted.

## CONCLUSION

A *de novo* review of the record evidence shows that the District Court improperly deployed the "lethal weapon" of summary judgment. Jabil was not held to its burden of proof, Subotic's evidence was ignored, and disputed issues of fact were decided by the District Court instead of the jury. The decision to grant summary judgment in favor of Jabil was an error that only reversal can remedy.

Respectfully submitted this 6th day of April, 2023.

/s/ Shaina Thorpe

SHAINA THORPE

Florida Bar No. 0055464

Primary:             shaina@thorpelaw.net

Secondary:         admin@thorpelaw.net

**THORPELAW, P.A.**

1228 East 7th Ave., Ste. 200

Tampa, Florida 33605

Telephone: (813) 400-0229

Fax: (813) 944-5223

*Counsel for Plaintiff-Appellant Boyan Subotic*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of April, 2023, a true and correct copy of this Brief was filed using the Court's CM/ECF system, which will automatically serve a notice of electronic filing on Defendant/Appellee at: William E. Grob, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., 100 N. Tampa Street, Suite 3600, Tampa, Florida 33602, william.grob@ogletree.com.

I FURTHER CERTIFY that on this 6th day of April, 2023, four paper copies of this Brief were transmitted to the United States Court of Appeals for the Eleventh Circuit via a commercial carrier for delivery within three days pursuant to Eleventh Circuit Local Rule 31-5 and Federal Rule of Appellate Procedure 25(c) at:

      Clerk of Court
      U.S. Court of Appeals for the 11th Circuit
      56 Forsyth St. N.W.
      Atlanta, Georgia 30303

                              *Shaina Thorpe*
                              Attorney